United States District Court
Southern District of Texas
**ENTERED**
December 12, 2023
Nathan Ochsner, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| TRINSEO, S.A., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:20-CV-0478 |
| | § | |
| STEPHEN HARPER, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## ORDER

Before the Court is Defendant Kellogg Brown & Root, LLC ("KBR")'s Motion for Summary Judgment (Doc. No. 129). Defendants Steve Harper, Steve Harper Consulting, Inc., Polycarbonate Consulting Services, Inc., William Davis, and Polycarbonate Resins Consulting, LLC (collectively, "Defendants") join KBR's motion. (Doc. No. 129 at 6). Plaintiff Trinseo Europe GmbH's ("Trinseo" or "Plaintiff") filed a response (Doc. No. 143). KBR filed a reply, and Trinseo filed a sur-reply. (Doc. Nos. 172, 190). After reviewing the briefings, evidence, and relevant law, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' motion (Doc. No. 129).

## I.    Background

This case involves the alleged theft of trade secrets used in the manufacturing of polycarbonate ("PC"). PC is a thermoplastic used to make eyeglasses, glass, and a variety of other products. PC has been made by a number of companies over the years. Historically, one of the major players in the PC industry was Dow Chemical Company ("Dow"). At some point in time, Dow placed its PC assets into a subsidiary named "Styron." In 2010, Dow sold Styron (along with its related intellectual property) to an affiliate of Bain Capital ("Bain"). Bain changed Styron's

name to "Trinseo," and the subsidiary Trinseo Europe GmbH became the eventual recipient of those assets. Trinseo Europe GmbH operates in the PC industry today. It is the Plaintiff herein.

Dow developed an interfacial process for developing PC and chose to patent this technology. Defendant Harper worked at Dow in the PC department and, along with other Dow PC employees, left Dow some years ago. After leaving, Harper began his own PC consulting business. In 2011, Defendants admit that Harper disclosed alleged trade secrets to Pete Pavlechko, an employee of SRI International ("SRI"). Pavlechko published the information in a 2011 SRI Report titled *Polycarbonate via Dow Phosgenation Process.* (Doc. 129-1, Ex. 4). Following the publication, Trinseo contacted SRI expressing concern that the report contained trade secrets that were not publicly available. SRI disclosed to Trinseo that it had worked with "various consultants" in writing the report. (Doc. No. 129-1 ex. 2 at 51:10-52:6). Ultimately, it appears that SRI published an updated version of the 2011 SRI Report with the blessing of a Trinseo employee, Jerry Duane ("Duane").

Then, in 2014, Trinseo and KBR crossed paths. KBR was either already performing or seeking to perform certain services in China. In support of KBR's operations there, it made the decision that it wanted to be able to offer its Chinese clients a complete package that would enable them to design, build, and operate PC plants. To further this goal, KBR began to search for individuals or an existing PC company to provide it with the expertise it lacked. It approached a number of individuals and entities, including Trinseo. The talks between KBR and Trinseo progressed far enough that in 2014 the two entities signed a confidentiality agreement to cover their negotiations. During these discussions, KBR told Trinseo's representatives that it had heard rumors that former Dow employees were "consulting" for third parties. The exact extent of this

disclosure is not exactly clear. Soon thereafter it was decided that the parties would not be going

forward in any joint business venture.

In 2017, KBR hired the co-defendants as consultants for their knowledge of the interfacial

PC process. KBR allegedly used an improved version of Dow's original technology and licensed

it to two clients before this litigation.  (Doc. No. 129 at 8). In the present litigation, Trinseo alleges

that the following items, (a) through (m), comprise trade secrets misappropriated by Defendants:

(a) preliminary design packages ("PDPs"), design drawings of manufacturing plants, process flow diagrams, equipment specifications, operating conditions for optimal polycarbonate production in the polymerization or "wet" side of a polycarbonate plant;

(b) product formulations and recipes for different grades of high quality polycarbonate flake with differing melt flows specifically for Trinseo's Calibre™ line of polycarbonate, including specific information about the composition of each product grade with acceptable ranges of composition (including, among others, the optimal combination of tints, dyes, pigments, mold release and thermal stabilizers, UV stabilizers, and ignition resistant additives for desired product grade and performance characteristics);

(c) *[omitted from the pleadings]*

(d) the concept, design, materials, specifications, operating instructions, software, control algorithms and plans to safely and efficiently design, build, and operate interfacial polycarbonate flake manufacturing facilities;

(e) the design of polycarbonate manufacturing plant components, such as the phosgene reactor, phosgene scrubber, dryers, devolatilization columns, piping and instrument design, wastewater stripping columns, along with the operating discipline, operating ranges, operating conditions, and flowrates that are part of the operating code for such components;

(f) the components contained within the continuous pipe reactor's pressure vessel containment system;

(g) specially designed atomization nozzles (also called mixing nozzles) used to atomize the polymer solution with high pressure steam without fouling or clogging the nozzle with polymer (including materials of construction, dimensions, tolerances, finishes, and optimal operating conditions and settings);

(h) the design and optimal operating conditions for the "snake" and loop process used in the devolatilizing drying process, with associated critical venturi, drying tubes and collection header, all of which are crucial to the efficient production of high-quality flake polycarbonate with a minimum of fines;

(i) the design of the MeCl2 stripper column that separates the polymer flake from the devolatilized methylene chloride solvent and devolatilizing steam;

(j) the design of the unique steam devolatilization process used to recover polymer from the washed polymer/solvent solution;

(k) the design of the thermal stabilizer system which allows for the easy addition of a thermal stabilizer to the polycarbonate prior to devolatilization;

(l) techniques for identifying the various trace impurities that can adversely impact the production of high quality polycarbonate flake and the specifications used during the production process that ensures a sufficiently low concentration of impurities; and

(m) techniques for manufacturing high-quality, marketable polycarbonate flake, including the positive and negative know-how that enables the cost-effective manufacture of high-quality polycarbonate and other confidential information regarding the design, commissioning, and optimization of interfacial polycarbonate manufacturing facilities, along with the techniques and positive and negative know-how learned from the start-up of other polycarbonate plants to optimize the efficient production of high-quality polycarbonate. . .

(Doc. No. 57 at 8–10) (Collectively the "Polycarbonate Trade Secrets").

Trinseo alleges misappropriation of these Polycarbonate Trade Secrets under the Defend Trade Secrets Act ("DTSA") and also brings Texas common law claims for misappropriation of confidential information, conversion, civil conspiracy, unjust enrichment, and vicarious liability. Importantly, Trinseo's state common law claims concern the same set of Polycarbonate Trade Secrets that form the basis of its DTSA claims. Trinseo's Second Amended Complaint concedes this point, as it pleads "to the extent that the [information comprising the Polycarbonate Trade Secrets] does not constitute 'trade secrets' but instead constitutes confidential information, Trinseo hereby alternatively asserts this claim for common-law misappropriation. . ." (Doc. No. 57 at 37). Duane also conceded in his deposition that the alleged trade secrets and the alleged confidential information are overlapping. (Doc. No. 129-1, Ex. 2 at 26:11–14). Defendants now move for summary judgment on Trinseo's DTSA and Texas common law claims.

## II.    Summary Judgment Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes

4

demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara*, 353 F.3d at 405. It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

## III.    Analysis

Defendants move for summary judgment on three issues. The first two relate to Trinseo's alleged failure to satisfy the requirements of the Defend Trade Secrets Act ("DTSA"), while the third relates to Trinseo's state common law claims. First, Defendants allege that Trinseo has not raised a genuine issue of material fact in support of the first element of DTSA requiring that the owner took "reasonable measures" to keep the alleged trade secrets secret. 18 U.S.C. § 1839(3). Second, for five of the alleged trade secrets, Defendants contend that Trinseo has failed to raise a genuine issue of material fact in support of the second element of DTSA requiring that the

information derive independent economic value "from not being generally known to, and not being readily ascertainable" to another person. 18 U.S.C. § 1839(3). These five alleged trade secrets are: (1) "Polymer Solution Atomizer Nozzle," (2) "'Snake' Design," (3) "Product Composition or Recipes," (4) "Steam Devolatilization Process," and (5) "Negative and Positive Knowledge." Third and finally, Defendants argue that the Texas Uniform Trade Secrets Act ("TUTSA") preempts Plaintiff's common law claims.

**A. Trinseo's "Reasonable Measures" to Keep Information Secret.**

Defendants argue that Trinseo cannot present a fact issue that Trinseo took "reasonable measures" to keep any of the alleged trade secrets secret. The DTSA defines "trade secrets" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken *reasonable measures to keep such information secret*; and
> (B) the information derives independent economic value, actual or potential, *from not being generally known to, and not being readily ascertainable through proper means* by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C § 1839(3) (emphasis added). Thus, to recover under the DTSA, a plaintiff must prove both prongs (A) and (B). At the summary judgment stage, however, a plaintiff must only raise a fact issue that, for each alleged trade secret, it took reasonable measures to keep the information secret, and that the information derives independent economic value from not being "generally known" and not being "readily ascertainable through proper means."

Defendants argue that "none of Trinseo's 'trade secrets' satisfy prong A of the DTSA definition because Trinseo knew that someone was disseminating its alleged trade secrets to competitors, but never even tried to investigate who that someone was so it could stop them."

(Doc. No. 129 at 8). First, Defendants note that Trinseo was aware of the 2011 SRI Report because Trinseo's then chief IP counsel Angelo Chaclas discovered the report and wrote to SRI that he was "certain" the report contained Trinseo's "highly confidential, proprietary, and non-public trade secret information." (Doc. No. 129-4, Ex.12 at 1).  Second, Defendants contend that in 2014, Trinseo suspected that ex-Dow employees had disclosed some of the alleged trade secrets to Chinese chemical company Luxi, as evidenced by minutes from Trinseo and KBR's 2014 meeting. According to Defendants, these minutes confirm that Trinseo was aware of "ex-Dow employees rumored to be practicing outside of confidentiality boundary." (Doc. No. 129-5, Ex. 14 at 7).  Third and finally, Defendant Harper had told Duane in 2014 that he was consulting in polycarbonates, and Duane did not ask about specifics or remind Harper about his confidentiality obligations. (Doc. No. 129-5, Ex. 15 at 162:10-165:17). Since Trinseo had this information and failed to adequately investigate it, Defendants argue that as a matter of law Trinseo failed to take "reasonable measures" to ensure the alleged trade secrets were kept secret.

In response, Trinseo points out that the DTSA does not require that the owner's efforts to maintain secrecy be perfect, only that they be reasonable. *See Sheets v. Yamaha Motors Corp.*, U.S.A., 849 F.2d 179, 183 (5th Cir. 1988) ("efforts required to maintain secrecy are those reasonable under the circumstances, and courts do not require extreme and unduly expensive procedures to be taken to protect trade secrets"); *see also Hertz v. Luzenac Group*, 576 F.3d 1103, 1113 (10th Cir. 2009) ("Just because there is something else that [a party] could have done does not mean that [its] efforts were unreasonable under the circumstances."). Trinseo highlights the measures taken by Dow, Styron, and Trinseo to protect the alleged trade secrets, including:

- Creating a Polycarbonate Polymer Technology Training Center Program, "which specifically both identified trade secrets associated with the technology and trained personnel on the steps to protect that information from unauthorized use or disclosure";

- Requiring employees and potential licensees of PC technology to sign confidentiality and nondisclosure agreements and limiting access to trade secret or confidential information to those who had a legitimate need to know the information;
- Restricting access to files and computers and undertaking other employment-related computer security measures;
- Using separate file rooms containing the protected information and ensuring the deliberate unavailability of copying facilities in such rooms;
- Utilizing building entry and security measures with controlled access gates and doors, security fencing, mandatory sign in/out procedures, and required escorts for plant visitors;
- Making extensive use of document confidentiality legends on documents containing trade secrets and confidential information;
- Creating a Technology Protection Strategy Document that detailed the key areas of technology that described the Protection Strategy implemented for each of these areas; and
- Creating a Technology Transfer Management Plan for the transfer of technology to a licensee.

(Doc. No. 143-28, Ex. 11, *Duane Decl.*); Doc. 78-1 at 112-13, *Duane Expert Report*). These efforts, Trinseo argues, raise a fact issue as to whether Trinseo took reasonable measures to protect the secrecy of its trade secrets. Trinseo maintains that summary judgment is therefore improper. (Doc. No. 143 at 10) (citing *DHI Group, Inc v. Kent*, 397 F. Supp. 3d 904, 920 (S.D. Tex. 2019) ("The trier of fact will need to weigh the evidence" as to whether plaintiff "took reasonable measures under the circumstances to keep the contents of its resume database secret.").

After reviewing the briefings, relevant law, and summary judgment evidence, the Court agrees with Plaintiff and finds that a genuine issue of material fact exists as to whether Trinseo took reasonable measures to protect the secrecy of the alleged trade secrets. Even taking into account Defendant's assertion that Trinseo had a duty to investigate the dissemination of its alleged trade secrets after the 2011 SRI Report and 2014 meeting with KBR, the Court finds that evidence in the record raises a fact issue as to whether Trinseo's investigation was reasonable.

For instance, after the 2011 SRI Report was published, Chaclas sent a letter to the Vice President of Legal and Business Affairs at SRI expressing concern over the report and "request[ing] that this Report be withdrawn from distribution and any distributed copies be retrieved." (Doc. No. 129-4, Ex. 12). In addition, during the 2014 meeting with KBR, Chaclas "asked KBR, if you hear of any names, let us know. It's in your mutual interest with us as a potential partner, our interests should be aligned here." Chaclas further testified that Trinseo "still had our standing instruction with our employees in China, that if they can ask and solicit feedback, if they come up with any names, to provide them." (Doc. No. 129-4, Ex. 13 at 125:14-21). In short, Trinseo asked both its potential business partner and its employees in China to be on alert for names and report back. Therefore, the record shows that Trinseo took *some* efforts to investigate the status of their trade secrets after seeing the 2011 SRI Report and hearing rumors of ex-Dow employees spreading confidential information.

This evidence, combined with the other security efforts listed above, raises a fact issue as to whether Trinseo took reasonable measures to keep their alleged trade secrets secret. Defendants' Motion for Summary Judgment is hereby denied on this issue.

**B. "Generally Known" or "Readily Ascertainable."**

Having found a fact issue exists on the first element, the Court now turns to the second. As mentioned, the DTSA requires that a trade secret "derives independent economic value, actual or potential, *from not being generally known to, and not being readily ascertainable through proper means* by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B) (emphasis added). Defendants argue that Trinseo cannot present a fact issue that five of the alleged Polycarbonate Trade Secrets were not "generally known" or "readily ascertainable." Specifically, Defendants argue that the "Polymer Solution

9

Atomizer Nozzle," and "'Snake' Design," were generally known from an expired patent, the "Product Composition or Recipes," were readily ascertainable by reverse engineering, the "Steam Devolatilization Process," was readily ascertainable by expired patents, and the "Negative and Positive Knowledge" secrets were, essentially, too vague and undefined to be trade secrets. The Court will address each of these arguments in turn.

     *i.*     *Polymer Solution Atomizer Nozzle and Snake Design*

Defendants claim that Trinseo's alleged trade secrets regarding the "polymer solution atomizer nozzle" and "snake design" are not trade secrets as a matter of law because they were disclosed in Dow's expired U.S. Patent No. 4,568,418 ("Snake Patent"). (Doc. No. 129-5, Ex. 17). Despite Trinseo's allegation that there are aspects of the nozzle and snake design which were *not* disclosed in the Snake Patent, Defendants argue that Trinseo has not described those aspects of the nozzle and snake with adequate specificity as to render them protected.

Plaintiffs bear the burden of identifying the trade secrets and showing that they exist. *SMH Enterprises, L.L.C. v. Krispy Krunchy Foods, L.L.C.*, No. 20-2970, 2021 WL 4460522, at *9 (E.D. La. Sept. 29, 2021) (citing *Source Prod. & Equip. Co. v. Schehr*, No. 16-17528, 2019 WL 4752058, at *5 (E.D. La. Sept. 30, 2019)). "This requires that the plaintiff 'clearly refer to tangible trade secret material' rather than a 'system which potentially qualifies for trade secret protection.'" *Id.* at *10 (quoting *InteliClear, LLC v. ETC Global Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). "Catchall" phrases or mere "categories" of trade secrets are inadequate. *Id.* (quoting *InteliClear*, 978 F.3d at 658). "However, the Fifth Circuit has never required that trade secrets 'be pled with extreme specificity.'" *Id.* (*quoting C&M Oilfield Rentals, LLC v. Location Illuminator Techs., LLC*, No. 18-39, 2020 WL 5745833, at *6 (W.D. Tex. Aug. 3, 2020)); *See also Brown & Root Indus. Servs., LLC v. Brown*, No. CV 21-291-JWD-SDJ, 2022 WL 4492087 (M.D. La. Sept. 9,

2022), report and recommendation adopted, No. CV 21-291-JWD-SDJ, 2022 WL 4490136 (M.D. La. Sept. 27, 2022). Moreover, courts in this district have found genuine issues of fact existed for trade secrets where it was "self-evident" that the details of a party's manufacturing materials, processes, and ingredients may contain trade secrets. *See Utex Indus., Inc. v. Wiegand*, No. CV 4:18-1254, 2020 WL 873985, at *10 (S.D. Tex. Feb. 21, 2020) (denying summary judgment challenging sufficiency of trade secret descriptions and finding descriptions sufficiently specific, including "mixing instructions used in operating mixers that create the rubber compounds"; "methods and systems for packaging the packing assemblies for storage and shipment"; and "results from tests of [plaintiff's] rubber compounds").

Here, Defendants' objections to Trinseo's description of the trade secrets can be summarized as follows. With regard to the nozzle, Defendants point to portions of Duane's deposition in which he identified as trade secrets certain elements of the nozzle that were not disclosed in the patent. (Doc. No. 129-1, Ex. 2 at 164:12-17). Defendants argue that Duane could not give enough details describing what about those elements made them Trinseo trade secrets. For instance, Duane testified that he could not remember "off the top of [his] head" which specific finish and which specific velocities are trade secrets. (*Id.* at 169:9-171:20). Additionally, while Duane testified that the nozzle's specific angles should be 35° and 45°, Defendants contend that the "angle used could easily be calculated, because you would have a schematic." (*Id.* at 181:22-182:77); (Doc. No 129-5, Ex. 19 at 168:1-7). Given that Duane could not provide any specific details about the angles, finish, and velocities of the nozzle which would not be discoverable through the patent, Defendants argue that the atomizer nozzle is not a trade secret as a matter of law.

With regard to the snake design, Defendants make similar objections to the level of detail Trinseo provided. Defendants again point to portions of Duane's deposition in which he identified elements of the snake design as trade secrets. Defendants argue that the following four elements were identified but cannot be trade secrets as a matter of law: (1) that the snake's length is "something in the neighborhood of 30 feet," (2) that the snake contains eighteen bends, (3) that the snake is "really, really smooth," and, (4) that the snake has a matching, or almost matching, diameter and no gaps between the nozzle and snake. (*Id.* at 191:18–207:22).

- **Length**: When asked "And on the length, if the snake tube is 31 feet, does that misappropriate a Trinseo trade secret in terms of snake length?" Duane answered "It's not detailed down to that exact number. The difference is between where you were at 20 and where you were at 30." (*Id.* at 196:7-199:14).

- **Eighteen Bends**: Duane could not explain why eighteen bends (the number Dow used in all of its snakes) was not generally known given that the Snake Patent permits a range of six to twenty bends and used examples with fifteen and twenty bends. (Doc. No. 129-1, Ex. 2 at 123:12-129:20); (Doc. No. 129-5, Ex. 17).

- **Smoothness**: When asked "is there a specific RMS (measure of smoothness) or other value associated with the smoothness that you need to have the snake bends be to be a Trinseo trade secret?" Duane answered "no there is not." (*Id.* at 196:7-199:14)

- **Matching Diameter and No Gaps**: Duane conceded that it does not matter what exactly the diameter of the various parts is, so long as the snake diameter generally matches up with the drying tube. He testified that the diameters do not have to match exactly, and that "it's generally done by feel." (*Id.* at 196:7-199:14)

Given Duane's uncertainty, Defendants argue that Trinseo has not identified what properties of the snake design are trade secrets undisclosed in the patent.

In response, Trinseo argues that "the specific details of the design are not revealed [in the Snake Patent], and those details make the design commercially viable and are the same improvements that Dow decided to keep as trade secrets rather than later patent." (Doc. No. 143 at 13). Plaintiff then cites to portions of Duane's two depositions that elaborate on this. In the depositions, Duane testified that Dow made improvements to the Snake Patent which Dow specifically chose to keep as trade secrets rather than disclose in a new patent. (Doc. No.145-45, Ex. 28 at 208:3-12). These improvements include angles, finishes, tolerances, materials, concentricity, threading, length, number of bends, and radius curvature. While Defendants are correct that Duane did not provide specific numerical values for each and every one of these elements, Duane did point to specific properties for several of them. For example, he testified that the metal used was Hastelloy C275, that the number of bends was 18, that the proper radius of the bends was 2.625 inches, and that the finish was "polished smooth" (which he states is a technical term associated with specific RMS values). (Doc. No. 145:46, Ex. 29 at 127:1-185:21). Thus, Trinseo argues that "Duane's testimony alone is enough to prove that the snake and nozzle design meets the definition of a trade secret, but at a minimum, it creates a genuine factual dispute for trial on the issue." (Doc. No. 143 at 15).[1]

Finally, Trinseo argues that "a cursory comparison of the snake and nozzle disclosed in the patent with what Trinseo claims as its trade secret, reveals salient differences raising an issue for

---

[1] Additionally, Plaintiff argues that "if the patent was sufficient to design the nozzle, one would expect to see evidence of that effort." (*Id.* at 14). Essentially, Plaintiff argues that KBR chose to plagiarize Dow's documents instead of designing from the Snake Patent. Plaintiff argues that this fact alone is sufficient to show that it has trade secrets. The Court finds this argument unavailing as it is not responsive to the summary judgment issue of whether there are nozzle properties and snake properties, beyond the disclosed patented information, that constitute trade secrets.

trial." (*Id.*) To aid in this "cursory" comparison, Trinseo attached a demonstrative comparing the nozzle designs. After taking a look at the demonstrative, the Court is, admittedly, not quite sure what it demonstrates. Nevertheless, it is clear that the image disclosed in the patent is relatively bare and generic, while the images from Dow, Trinseo, and Harper contain more detail. (Doc. No. 145-58, Ex. 41).

After reviewing the parties' arguments, the summary judgment evidence, and the relevant law, the Court finds that a genuine issue of material fact exists supporting Trinseo's alleged nozzle and snake design trade secrets were not generally known or readily ascertainable from the Snake Patent.

Here, the Court finds that Trinseo has defined the nozzle and snake design trade secrets with more particularity than mere catchall phrases or categories. *See InteliClear*, 978 F.3d at 658. As such, Trinseo has presented sufficient evidence to overcome summary judgment. *See Utex Indus., Inc. v. Wiegand*, No. CV 4:18-1254, 2020 WL 873985, at *10 (S.D. Tex. Feb. 21, 2020) (denying summary judgment challenging sufficiency of trade secret descriptions and finding descriptions sufficiently specific, including "mixing instructions used in operating mixers that create the rubber compounds"; "methods and systems for packaging the packing assemblies for storage and shipment"; and "results from tests of [plaintiff's] rubber compounds"). In his first deposition, Duane testified that several aspects of the nozzle that were not disclosed in the patent— the angles, finishes, dimension tolerances, materials of construction, concentricity, and threading—were all Trinseo trade secrets. (Doc. No. 154-45, Ex. 28 at 208:3-12, 230:3-240:10). Duane also testified that several aspects of the snake design that were not disclosed in the patent— the finishes, tolerances, materials of construction, concentricity, threading, number of bends, and radius curvature—were all Trinseo trade secrets. (*Id.* at 240:3-242:25). This testimony is enough

to raise a fact issue for trial as to whether the undisclosed details of the nozzle and snake design are trade secrets. Defendants' motion as to this issue is hereby denied.

ii.   *Product Composition and Recipes*

Defendants next claim that Trinseo's Polycarbonate "Product Composition and Recipes" are not trade secrets as a matter of law because they are "generic and reverse engineerable." (Doc. No. 129 at 18).

Once again, a trade secret under the DTSA must derive economic value from not being generally known and not being readily ascertainable through proper means. The DTSA further states that "'improper means' . . . does not include reverse engineering, independent derivation, or any lawful means of acquisition." 18 U.S.C. § 1839(6). It follows, then, that an alleged trade secret may not ultimately qualify as a trade secret if it may be reverse engineered. Nevertheless, "the mere potential for reverse engineering with unlimited resources does not foreclose the existence of a trade secret." *Mallet & Co. v. Lacayo*, 16 F.4th 364, 387 n.31 (3d Cir. 2021).

Defendants argue that polycarbonate is composed of base resin and additives, and that companies often advertise their own products as "equivalents" of competitors' polycarbonates. Defendants argue that companies reverse engineer each other's PC formulas frequently and that reverse engineering is commonplace in the industry. (Doc. No. 129 at 19).

To support this, Defendants point to the testimony of Duane Priddy ("Priddy"), an ex-Dow employee. Priddy admitted that polycarbonate composition can be reverse engineered. (Doc. No 129 at 20). In his deposition, Priddy stated that "if you give me a piece of plastic—because I'm a highly experienced polymer chemist—I can totally deformulate it and tell you anything you want to know about it." (Doc. No. 129-5, ex. 22 at 44:5–45:11). He also estimated that contracting out the deformulation process to a lab costs "probably in the ballpark of $10,000." (*Id.* at 46:11–12).

Finally, Defendants point to Dow's research and development ("R&D") reports to demonstrate that Dow also engaged in reverse engineering competitors' products to improve its own. (Docs. No. 129-5–129-6, Ex. 24–27). Thus, Defendants argue that it is "undisputed that it is possible to reverse engineer PC [polycarbonate] products." (Doc. No. 129 at 20). Accordingly, they maintain that the trade secrets concerning PC formulations and recipes claimed by Trinseo are readily ascertainable and not trade secrets as a matter of law.

In response, Trinseo argues that the mere fact that a product is capable of being reverse engineered does not mean that Trinseo's specific PC formulations are readily ascertainable. (Doc. No. 143 at 18). Trinseo points to testimony by Duane in which he states that the formulations were not generally known or readily ascertainable to others, including KBR. (Doc. No. 145:46, Ex. 29 at 149:10–150:06); *see also* (Doc. No 78-1 at 109-110). Trinseo also notes that much of the reverse engineering in the industry, like the kind described in the Dow R&D reports, is designed to measure performance characteristics, not duplicate formulations. (Doc. No. 145:46, Ex. 29 at 152:5–23). Trinseo further notes that Dow's R&D was not often successful in discerning additives, indicating that the alleged industry practice of "reverse engineering" is not as easy as Defendants posit. (Doc. No. 143 at 18).

The Court finds the following footnote by the Third Circuit instructive on the issue of whether this kind of potential reverse engineering may defeat trade secrets as a matter of law:

> The Defendants would also have us insulate trade secret thieves from liability as long as reverse engineering of a secret was hypothetically an available alternative to access the trade secret information. We decline to do so. The DTSA expressly addresses the relationship between reverse engineering and trade secret misappropriation. And it excludes reverse engineering from the type of conduct it defines as misappropriation. 18 U.S.C. § 1839(6). But while "reverse engineering is a defense to misappropriation of [a] trade secrets claim, **the possibility that a trade secret might be reverse engineered is not a defense**." *Bal Seal Eng'g, Inc. v. Nelson Prods., Inc.*, No. 8:13-cv-1880, 2018 WL 4697255, at *4 (C.D. Cal. Aug. 3, 2018) (internal quotation marks and citation omitted); *see also Imperial Chem.*

*Indus. Ltd. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 743 (2d Cir. 1965) (**"It is no defense in an action of this kind that the process in question could have been developed independently, without resort to information gleaned from a confidential relationship."**). To hold otherwise would fly in the face of commonsense and allow a defendant to escape liability for unlawfully stealing trade secrets as long as someone might – hypothetically and at unknown cost in time, effort, and money – figure out some means to discover them through reverse engineering. **There may be situations in which reverse engineering is so straightforward that the distribution of a product is itself akin to a disclosure**. That kind of situation is, we believe, addressed in our comment in *SI Handling Sys., Inc. v. Heisley*, that "[m]atters which are fully disclosed by a marketed product and are susceptible to 'reverse engineering'—i.e., 'starting with the known product and working backward to divine the process which aided in its manufacture,'—cannot be protected as trade secrets." 753 F.2d 1244, 1255 (3d Cir. 1985) (*quoting Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974)). But short of that factual scenario, **the mere potential for reverse engineering with unlimited resources does not foreclose the existence of a trade secret.**

*Mallet & Co. v. Lacayo*, 16 F.4th 364, 387 n.31 (3d Cir. 2021) (emphasis added).

With this standard in mind, after examining the relevant briefings, summary judgment evidence, and case law, the Court finds that a genuine issue of fact remains as to whether Trinseo's formulations were readily ascertainable, and Defendants' motion is hereby denied on this issue. Trinseo has presented evidence, albeit from its own employees, that Trinseo's polycarbonate formulations were not generally known and that reverse engineering in the polycarbonate space is not always successful or easy. Thus, this Court cannot say as a matter of law that the specific formulas at issue are readily ascertainable simply because polycarbonates, generally, are susceptible to reverse engineering at varying degrees of success. The Court is not aware of any evidence that KBR—or any of the other Defendants—*actually tried* to reverse engineer the PC formulations at issue. Without such evidence, the Court cannot say that the PC formulations were generally known or readily ascertainable as a matter of law. At the very least, Priddy's testimony that sending polycarbonate testing to a lab costs roughly $10,000 creates a fact issue as to whether

reverse engineering PC formulas is "so straightforward" as to be readily ascertainable. *Mallet*, 16 F.4th at 387 n.31.   Defendant's motion for summary judgment on this issue is therefore denied.

 *iii.* *Steam Devolatilization Process*

  Defendants claim that Trinseo's "steam devolatilization process" is not a trade secret because its elements are (1) the atomizer nozzle, (2) the snake design, and (3) a "methylene chloride stripper column." (Doc. No. 129 at 21). They argue that each of these three components is not a trade secret, and that "Trinseo has never explained how the mere combination of the stripper column with the atomizer nozzle and snakes is not generally known or readily ascertainable."

  Defendants cite to *Bimbo Bakeries USA, Inc v. Sycamore* for the proposition that a "compilation of information within the public domain may constitute a trade secret, but, of course, the compilation must not itself be generally known or readily ascertainable." 39 F.4th 1250, 1261 (10th Cir. 2022). Defendants appear to argue, then, that the steam devolatilization process is a readily ascertainable compilation of generally known elements.

  This argument fails on its face. As an initial matter, this Court has just found that a fact issue exists as to whether the atomizer nozzle and snake design are trade secrets. Thus, a process incorporating them would necessarily raise the same fact issues. More importantly, though, Defendants have not argued that the methylene chloride stripper column is not a trade secret as a matter of law. In fact, they acknowledge that "Trinseo has claimed the stripper column as a standalone trade secret **(which KBR will disprove at trial)**." (Doc. No. 129 at 22) (emphasis added). Thus, Defendants simultaneously claim that the entire process is not a trade secret as a matter of law, while admitting that the trade secret status of one of the three elements is an issue for trial.

Even looking past these obvious problems with Defendants' argument, the Court finds that Trinseo has presented sufficient evidence to raise a fact issue that the steam devolatilization process is a trade secret. Trinseo notes that neither the Snake patent nor the finalized 2011 SRI Report disclose the materials, specifications, and operating conditions that make up the process. (Doc. No. 143 at 20). Trinseo also points to specific portions of Duane's deposition and report that describe the specific materials, flow sheets, operating conditions, and specifications of the steam devolatilization process—all of which Trinseo alleges were not publicly available. (*Id.*).

For the above reasons, the Court denies Defendants' motion on this issue.

iv. *Negative and Positive Knowledge*

Finally, Defendants claim that Trinseo's alleged trade secret of "negative and positive knowledge" has not been described with sufficient detail. Defendants assert that "The case law is clear: 'negative and positive knowledge' is too vague to be a trade secret."[2] They argue that the DTSA sets a standard requiring that a plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special persons who are skilled in the trade, and to permit the defendant to ascertain at least the boundaries within which the traded secret lies." *AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1144–46 (N.D. Cal. 2019). Trinseo's grouping of negative and positive knowledge, Defendants argue, is too vague and undefined such that they "cannot fairly be expected to rebut Plaintiff's trade secrets claim." *See Loop AI Labs Inc. v. Gatti*, 195 F. Supp. 3d 1107, 1114–15 (N. D. Cal. 2016). Specifically, Defendants point to a portion of Duane's deposition in which he

---

[2] This is an overstatement of the law, and the Court cautions counsel against making such assertions. *See Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202–03 (5th Cir. 1986) (correcting the District Court's "misreading" that "negative know-how" cannot constitute a trade secret); *Genentech, Inc. v. JHL Biotech, Inc.*, C 18-06582 WHA, 2019 WL 1045911, at *19 (N.D. Cal. Mar. 5, 2019); *On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp. 2d 313, 323 (D. Conn. 2003).

answered "yes" to the question "so it's up to the defendants to go through those documents and try to figure out what specific positive and negative knowledge is a trade secret?" (Doc. No. 129-1, Ex. 2 at 235:19-23).

In response, Trinseo points out that Duane's expert report cites by bates number more than two dozen documents reflecting the negative and positive knowledge that describe Dow's development of the polycarbonates process. (Doc. No. 78-1 at 101); *See Motorola, Inc. v. Lemko Corp.*, No. 08-cv-5427, 2012 WL 74319, at *17 (N.D. Ill. Jan 10, 2012) (denying summary judgment where plaintiff had identified trade secrets by reference to specific bates-labeled documents). Moreover, Trinseo notes that Duane elaborated on one document, the "Stade Report," which details Dow's various errors, investigations, and corrections when starting up its Stade Polycarbonate Plant for use in future plant construction. (Doc. No. 144-38, Ex. 54). In Defendant Harper's deposition, he referenced this report. Trinseo alleges that Harper turned it into a "Lessons Learned" report, which he sold to Luxi for $25,000 (Doc. No. 143-19, Ex. 2 at 165:6–173:12) (Q: "Was that document, the State Report, the basis of the lessons-learned report that you did for Luxi?"; A: "yeah. There were lessons learned from—from Freeport and Stade—I think I put some stuff from Stade in there."). In addition, Trinseo attached a table specifically describing the contents of documents identified in Duane's report where positive and negative knowledge are being imparted. (Doc. No. 189-1 at 1–2). Therefore, Trinseo argues they have produced enough evidence to raise a fact issue as to whether its identified body of negative and positive knowledge constitutes a trade secret.

Given that Defendants do not dispute that the contents of the documents contain negative and positive knowledge, only that they were insufficiently described, the Court hereby denies Defendants' motion on this issue. Trinseo has raised a fact issue by listing the bates numbers in

Duane's report, presenting the Stade Report,[3] and providing Defendants with a table summarizing Duane's report. Defendants' motion is hereby denied on this issue.

## C. TUTSA Preemption

Defendants also move for summary judgment on Trinseo's Texas common law claims, arguing that TUTSA preempts state law remedies for misappropriation of trade secrets and for misappropriation of confidential information. TUTSA provides a statutory cause of action for misappropriation of trade secrets and contains the following preemption provision: "this chapter displaces conflicting tort, restitutionary, and other law of this state providing civil remedies for misappropriation of a trade secret." Tex. Civ. Prac. & Rem. § 134A.007(a). Additionally, subsection (b) further states that the preemption provision "does not affect. . . (2) other civil remedies that are not based upon misappropriation of a trade secret." *Id.* at § 134A.007(b).

The parties here disagree about the scope of this preemption clause. This disagreement is not unfounded, given that the Supreme Court of Texas has yet to rule on the issue. On one hand, Defendants argue that the preemption provision is broad. They argue that the goal of TUTSA is to preempt any common law claim for the alleged misuse of confidential and propriety information that "duplicates" the plaintiff's statutory claim for misappropriation of trade secrets. (Doc. No. 172 at 17). Since Trinseo's alleged trade secrets and alleged confidential information are both based on the same underlying facts, Defendants argue that the misappropriation of confidential information claims are preempted. They contend that Trinseo cannot simultaneously argue that the

---

[3] In their Reply, Defendants object to the Stade Report, apparently because "the report is dated 1992 and is not even marked 'confidential,' the easiest measure an alleged trade secret owner can take to protect its alleged secrets." (Doc. No. 172-22). A "confidential" label is only one factor in determining whether something is a trade secret, and the absence of one is not dispositive. *See S. Field Maint. & Fabrication LLC v. Killough*, No. 2:18-cv-581-GMB, 2019 WL 360515, at *4 (M.D. Ala. Jan. 29, 2019). Thus, this argument is unavailing at the summary judgment stage.

same set of information is both a trade secret and not a trade secret, and in the process seek a recovery regardless of the answer.

On the other hand, Trinseo argues that TUTSA's preemption is narrower and only preempts state law claims for misappropriation of trade secrets, not misappropriation of confidential business information. Trinseo notes that the text of the preemption provision only uses the phrase "trade secret." "Trade secret" is a defined term under TUTSA, so Trinseo argues that the legislature's use of the term in the preemption provision is intentional. *See* Tex. Civ. Prac. & Rem. § 134A.002(6). Since business information can be confidential without necessarily rising to the statutory definition of "trade secret," Trinseo contends that their claims for misappropriation of confidential information fall outside the scope of TUTSA's preemption. As such, Trinseo argues that they should be permitted to bring their alternative theories of relief.

As noted above, the Supreme Court of Texas has not ruled on this issue. This Court must therefore make an "*Erie* guess" to determine "how that court would resolve the issue if presented with the same case." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007). When faced with the same issue under Louisiana law, the Fifth Circuit looked first to the text of the statute (the Louisiana Uniform Trade Secrets Act, or "LUTSA")[4] and then to the decisions of Louisiana intermediate courts. *Brand Servs., L.L.C. v. Irex Corp.*, 909 F.3d 151, 157 (5th Cir. 2018).

Upon looking at the text of the statute, the Fifth Circuit concluded that the "plain text" of the statute preempts conversion claims involving confidential information that qualifies as a trade secret. *Id* at 158. The Fifth Circuit did not, however, address the trickier question—whether preemption applies to claims involving confidential information that does *not* qualify as a trade

---

[4] The preemption provisions of LUTSA and TUTSA are, in relevant part, identical.

secret—by looking at the text alone. Instead, the Circuit noted a tension between the preemption

provision and LUTSA's uniformity provision. This uniformity provision explicitly instructed that

LUTSA shall be construed to effectuate its purpose to make the law uniform among states. The

Fifth Circuit then observed:

> …[C]ourts interpreting their respective states' versions of the Uniform Trade Secret Act ("UTSA") have not uniformly applied UTSA's preemption provision; instead, courts have come to varying conclusions about the preemption provision's intended scope. Thus, because there is not enough uniformity among states to predict how the Louisiana Supreme Court would decide the issue, we look to intermediate state court decisions.

*Id.* at 158 (citations omitted).

After examining state court decisions, the Fifth Circuit noted that Louisiana appellate

courts ruled twice that LUTSA does not preempt claims for confidential information that does not

rise to the level of a trade secret. As a result, the Fifth Circuit determined that LUTSA "does not

preempt civilian law claims for conversion of information that does not constitute a trade secret

under LUTSA." *Id.* at 159.

Following the Fifth Circuit's guidance, this Court agrees that the text of the statute alone

cannot answer the question of whether claims involving confidential information that does not

constitute a trade secret are preempted. The language of the TUTSA preemption provision mirrors

LUTSA. *See* Tex. Civ. Prac. & Rem. § 134A.007(a); *cf.* La. Stat. Ann. § 51:1437. TUTSA's

uniformity provision is likewise the same as LUTSA's. *See* Tex. Civ. Prac. & Rem. § 134A.008;

*cf.* La. Stat. Ann. § 51:1438. The Fifth Circuit noted the lack of uniformity concerning UTSA as a

motivating factor to look at the state intermediate court decisions. With regard to this case, there

is not only a lack of uniformity among the majority of UTSA states, but also a lack of uniformity

within the state as to the interpretation of TUTSA.[5] Thus, following the direction of the Fifth

---

[5] *Compare AMID, Inc. v. Medic Alert Found. United States, Inc.*, 241 F. Supp. 3d 788 (S.D. Tex. 2017), *with Stress Engineering Services, Inc. v. Olson*, No. 4:21-cv-3210, 2022 WL 4086574 (S.D. Tex. Aug. 4, 2022), *report and*

Circuit in *Brand Services*, this Court must look to Texas intermediate appellate courts for guidance. 909 F.3d at 158.

Recent Texas appellate court cases do provide some guidance. *See Super Starr International v. Fresh Tex Produce*, 531 S.W.3d 829 (Tex. App.—Corpus Christi-Edinburg 2017, no pet.); *Title Source v. HouseCanary*, 612 S.W.3d 517 (Tex. App.—San Antonio 2020, pet. denied). In *Super Starr*, the court held that a breach of fiduciary duty claim based on confidential and proprietary information was preempted because it "duplicate[d] [the] alleged violation of [TUTSA]." *Super Starr*, 531 S.W.3d at 843. In *TitleSource*, the court similarly determined that "when the gravamen of a common law claim duplicates a TUTSA claim, the common law claim is preempted." *TitleSource*, 612 S.W.3d at 533.

In 2018, a court in the Western District of Texas analyzed the holding in *Super Starr* and found that "the underlying purpose of the TUTSA preemption is, as many courts have noted, to 'prevent inconsistent theories of relief for the same underlying harm by eliminating alternative theories of common law recovery which are premised on the misappropriation of a trade secret.'" *Embarcadero*, 2018 WL 315753 at *3 (W.D. Tex. Jan. 5, 2018) (quoting *Super Starr*, 531 S.W.3d at 843). Indeed, "to narrow the preemption's application exclusively to information that qualifies as a trade secret under the statute would frustrate that purpose." *Id*. The court in that case ultimately found that TUTSA's preemption clause applies to a breach of fiduciary duty claim that is based solely upon taking confidential information. *Id*.

Other district courts have followed a similar analysis when ruling on the issue. In *Steves & Sons, Inc. v. JELD-WEN*, Inc., No. 3:16-CV-545, 2018 WL 1796293 at *11 (E.D. Va. Apr. 16, 2018), the court noted that "*Super Starr* is properly understood as requiring preemption both where

_____

*recommendation adopted*, No. 4:21-cv-3210, 2022 WL 4084433 (S.D. Tex. Sept. 6, 2022), *and Embarcadero Techs., Inc. v. Redgate Software, Inc*., No. 1:17-CV-444-RP, 2018 WL 315753 (W.D. Tex. Jan. 5, 2018).

24

a tort claim depends on the misappropriation of trade secrets alone, and where such a claim is dependent on the misappropriation of either trade secrets or confidential information." Similarly, a court in the Eastern District of Texas found that TUTSA "preempts all claims based on the challenged improper taking of trade secret and confidential business information." *StoneCoat of Texas, LLC v. ProCal Stone Design, LLC*, 426 F. Supp. 3d 311, 339 (E.D. Tex. 2019).[6]

Accordingly, after analyzing Texas intermediate appellate court rulings on the issue, this Court finds that where a plaintiff brings a common law misappropriation of confidential information claim based on the same underlying wrongful acts and concerning the same information as its misappropriation of trade secrets claim, TUTSA preemption applies. This approach prevents "inconsistent theories of relief for the same underlying harm." *See Embarcadero*, 2018 WL 315753 at *3.[7]

This is exactly the case here. In Trinseo's Second Amended Complaint, Trinseo chose not to separate the information it claims as trade secrets from the information it claims as confidential. (Doc. No. 57 at 37). Rather, Trinseo pled "in the alternative" for all of its alleged trade secrets based on the same underlying conduct of Defendants. (*Id.*). Moreover, Trinseo's expert Duane concedes that Trinseo's DTSA claim and its common law misappropriation of confidential information claim are based on the same information.[8] (Doc. No. 129-1, Ex. 2 at 265:11-14).

---

[6] Trinseo points to another court in the Southern District of Texas, which found that TUTSA does not preempt misappropriation of confidential information claims where, as here, plaintiff pleaded the misappropriation of confidential information claim "in the alternative" to its trade secrets claim. *AMID, Inc. v. Medic Alert Found. United States, Inc.*, 241 F. Supp. 3d 788 (S.D. Tex. 2017). That case, however, was decided prior to the Texas intermediate appellate courts weighing in on the issue.

[7] The Court need not determine at this juncture whether TUTSA preempts all common law claims for misappropriation of confidential information (for example, where a plaintiff distinguishes between information it considers to be trade secrets, and information it considers to be merely "confidential"). The only issue before the Court is whether TUTSA preempts common law claims for misappropriation of confidential information where that information is admittedly the same information underlying its cause of action under the DTSA.

[8] The Court recognizes that Trinseo has not brought a claim under TUTSA—Trinseo's misappropriation of trade secrets claim was brought under the DTSA. This is immaterial for the purpose of analyzing whether Trinseo's common law claim for misappropriation of confidential business information is preempted by the statute.

25

Trinseo's claims for misappropriation of confidential information duplicate its claims for misappropriation of trade secrets. Accordingly, the Court holds that TUTSA preemption applies to bar Trinseo's common law claim for misappropriation of confidential information. The Court grants Defendants' Motion for Summary Judgment on this issue.

### I.      Conclusion

The Court denies Defendants' Motion for Summary Judgment as it pertains to Trinseo's alleged failure to take reasonable measures to keep information secret. The Court also denies Defendants' Motion on the generally-known prong as it pertains to (1) the polymer solution atomizer nozzle and snake design, (2) the product composition or recipes, (3) the steam devolatilization process, and (4) Negative and Positive Knowledge. Finally, the Court grants Defendants' motion as to preemption and finds that Trinseo's cause of action for common law misappropriation of confidential information is preempted by TUTSA.

The Court has now resolved most, if not all, of the important motions governing this case. While there may be several remaining disputes, the boundaries of the case have certainly been defined and the parties should certainly have a good idea of what issues will be entailed in the trial. The trial setting is firm, and the Court expects to try the case as scheduled. As is probably evident to all, this Court has felt for some time that the parties should resolve this matter and urges all sides to make their best efforts to avoid further costs and expenses.

SIGNED at this 12 day of December 2023.

Andrew S. Hanen
United States District Judge